UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RHONDA DURHAM,

                   Plaintiff,                       CIVIL ACTION NO. 12-14039

        v.                          DISTRICT JUDGE MARK A. GOLDSMITH

                                    MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

                   Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 14, 18)

Without the assistance of an attorney, Plaintiff Rhonda Durham challenges the Commissioner of Social Security's ("the Commissioner") final denial of her benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 14, 18). Judge Mark A. Goldsmith referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 3).

**I.     RECOMMENDATION**

Plaintiff's motion is brief, but sufficient to draw the Court's attention to the Administrative Law Judge's review of her medical evidence. Because it is unclear whether the ALJ considered Plaintiff's treating neurologist's opinion, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, the Commissioner's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner.

II.     **DISCUSSION**

   *A.     Framework for Disability Determinations*

Under the Social Security Act, (the "Act") Disability Insurance Benefits and

Supplemental Security Income are available only for those who have a "disability." *See Colvin*

*v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as

the inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment, which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months. 42

U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity,
> benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of
> impairments that "significantly limits . . . physical or mental ability to do basic
> work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a
> severe impairment that is expected to last for at least twelve months, and the
> severe impairment meets or equals one of the impairments listed in the
> regulations, the claimant is conclusively presumed to be disabled regardless of
> age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits
> are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work,
> if other work exists in the national economy that plaintiff can perform, in view of
> his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534

(6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the

analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B.      Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v.*

*McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

## III.   REPORT

### A.     *Administrative Proceedings*

Plaintiff applied for disability insurance benefits on February 10, 2010, alleging she became disabled on December 18, 2009 (Tr. 23). After the Commissioner initially denied Plaintiff's application, she appeared without counsel for a hearing before ALJ Myriam C. Fernandez Rice, who considered the case *de novo*. In a written decision, the ALJ found Plaintiff was not disabled (Tr. 23-35). Plaintiff requested an Appeals Council review (Tr. 209-211). The ALJ's findings became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 1-2).[1]

### B.     *ALJ Findings*

---

[1]The date of the Appeals Council's decision is unclear because the first page of the decision is missing.

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that she had not engaged in substantial gainful activity since her alleged onset date in December of 2009 (Tr. 25).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: herniated discs, a pinched nerve in her lower back, status post lumbar interbody fusion, and plantar fasciitis (Tr. 25).[2]

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 26).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform:

> sedentary work[3] . . . except [Plaintiff] can only occasionally operate foot controls with her right foot; can only occasionally perform overhead reaching and handling; and occasionally can climb ladders, ropes, or scaffolds, climb ramps or stairs, balance, stoop, crouch, kneel, and crawl.

 (Tr. 27).

At step four, the ALJ found that Plaintiff could not perform her past relevant work as a packager or home aide (Tr. 33).

---

[2]"Plantar fasciitis is inflammation of the thick tissue on the bottom of the foot. This tissue is called the plantar fascia. It connects the heel bone to the toes and creates the arch of the foot." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004438/ (last visited September 5, 2013).

[3]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).  "'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about [two] hours of an [eight]-hour workday.  Sitting would generally total about [six] hours of an [eight]-hour workday."  SSR 96-9p.

At step five, the ALJ found Plaintiff was not disabled, because she could perform a significant number of jobs available in the national economy (Tr. 34-35).

### C.    Administrative Record

#### 1.    Plaintiff's Hearing Testimony and Statements

Plaintiff has a tenth grade education; she is a slow reader and can only do basic math (Tr. 49).  According to Plaintiff, she cannot work due to back pain and plantar fasciitis in her feet (Tr. 46).  She also has a degenerative disc, "a little bit" of depression, acid reflux, and crooked shoulders (Tr. 46, 50, 56).  The muscle and the bone in Plaintiff's right foot are separating, and it burns when she walks or stands for an extended period of time (Tr. 53).  She also does not walk alone because her foot rolls and she falls (Tr. 51).  Plaintiff says she is not very active and has gained weight because her "ability to do certain daily tasks is a challenge" (Tr. 46, 54).

Plaintiff testified that it is painful to bend and twist; her hip occasionally "gives out"; she has to lie down throughout the day; and, she sometimes needs to take a nap (Tr. 49-50).  Plaintiff has to sleep on her left side and keep her feet elevated; when she turns, she feels a sharp pain that wakes her up (Tr. 50).  Plaintiff takes Lorcet (pain reliever), Flexeril (muscle relaxant), and Vicodin when needed (Tr. 50).  She described having "good day[s] where [she] can sit for a little while and [] bad day[s] where [she] can[not] sit for very long at all. [She] ha[s] very few good days"; she can lift approximately 25 pounds, but cannot twist, bend, turn, or reach overhead (Tr. 51-53).

Despite Plaintiff's daily pain, she can do some housework (e.g., laundry, washing dishes (sitting down), light dusting, vacuuming (when she can), and occasional sweeping and mopping) (Tr. 46, 49, 51).  She can also drive (although, it is painful to push on the pedals) (Tr. 52).

#### 2.    Relevant Medical Evidence

On February 8, 2006, Plaintiff complained that her leg sometimes "gave out," and she had pain in her lower back (Tr. 216).[4]  An MRI of Plaintiff's lumbar spine revealed the following:

> **Findings**:  Alignment is normal.  The T2 signal is attenuated within the lower two lumbar discs indicating desiccation.[5]  The conus terminates at the T12 level.  The axial images demonstrate post op change from right sided L5 laminotomy.[6]  The disc herniation present on th[e] previous study at this level has been resected and there is slight annular bulging of the disc but no evidence of recurrent herniation.  The L4-5 level has an annular bulging disc and mild facet arthropathy.[7]
>
> **Impression**: Interval right sided laminotomy and resection of the disc herniation.  No evidence of recurrent disc herniation.  There is a small amount of enhancing scar surrounding the right S1 nerve root best appreciated on the post gadolinium examination.

(Tr. 217).

On October 23, 2006, Plaintiff still had pain in her lower back that radiated down her right leg and caused weakness; Plaintiff had difficulty walking (Tr. 221).

On November 21, 2006, an imaging report of Plaintiff's lumbar spine showed decreased disc space at L5-S1, and spinous rotation and curvature at L4 (Tr. 378).

---

[4]Plaintiff has had back pain since 1999 (Tr. 233).

[5]"Desiccation is a scientific word meaning 'dry' which means that the inside of the disc is drying out."  *See* http://www.examiner.com/article/disc-desiccation-and-spinal-back-treatment (last visited September 7, 2013).

[6]"Laminotomy is the surgical incision and removal of a small part of a bony area of the spine called the lamina. The lamina is the back part of each vertebra and forms the back wall of [the] spinal canal. [The] spinal cord runs through [the] spinal canal in the center of [the] vertebrae.  Certain conditions of the spine can compress the spinal cord and cause pain. A laminotomy can relieve pressure in [the] spinal canal and on spinal nerves."  *See* http://www.healthgrades.com/procedures/laminotomy (last visited September 7, 2013).

[7]"[F]acet arthropathy is degenerative arthritis affecting the facet joints in the spine.  In the area of the spine where there are facet joints, arthritis pain can develop."  *See* http://arthritis.about.com/od/spine/p/facet_joints.htm (last visited September 7, 2013).

On July 30, 2009, Plaintiff reported that her lower back pain was getting worse (Tr. 351).


An x-ray of Plaintiff's spine revealed the following:

> There were no acute fractures evident.  There [was] intervertebral disc space narrowing at L5-S1, consistent with degenerative disc disease.[8]  The remaining intervertebral disc spacings and the vertebral body heights appeared adequately maintained.  Vertebral body alignment [was] within normal limits.  The lumbar pedicles,[9] transverse processes,[10] and spinous processes appeared intact.[11]  Oblique projections demonstrate the facet articulations to be within normal limits.  There [was] no evidence of spondylolysis or spondylolisthesis.[12]

---

[8]"Degenerative disc disease is not really a disease at all, but rather a degenerative condition that at times can produce pain from a damaged disc."  *See* http://www.spine-health.com/conditions/degenerative-disc-disease/what-degenerative-disc-disease (last visited September 7, 2013).


[9]"The pedicle is a paired, strong, tubular bony structure made of hard cortical bone on the outside and cancellous bone on the inside.  Each pedicle comes out of the side of the vertebral body and projects to the back.  Pedicles act as the lateral (side) walls of the bony spinal canal that protects the spinal cord and cauda equina, or nerve roots, in the lumbar region."  *See* http://www.knowyourback.org/Pages/Definitions/AnatomySpine/Bones/Vertebrae.aspx (last visited September 9, 2013).

[10]"Transverse process is a small bony projection off the right and left side of each vertebrae.  The two transverse processes of each vertebrae function as the site of attachment for muscles and ligaments of the spine as well as the point of articulation of the ribs (in the thoracic spine).  During a posterolateral spinal fusion surgery, the bone graft is placed between the transverse processes of the affected vertebrae."  *See* http://www.spine-health.com/glossary/transverse-process (last visited September 9, 2013).

[11]"Spinous process is the medical term for each one of those bony knobs you can feel when you run your fingers along your spinal column.  Each vertebra is made up of several bony structures and the spinous process is the most prominent to us because we can actually feel it through the skin.  The spinous process is an important site for the attachment of spinal muscles."  *See* http://www.laserspineinstitute.com/back_problems/spinal_anatomy/vertebrae/spinous/ (last visited September 9, 2013).

[12]"Spondylolysis is a specific defect in the connection between vertebrae, the bones that make up the spinal column. This defect can lead to small stress fractures (breaks) in the vertebrae that can weaken the bones so much that one slips out of place, a condition called spondylolisthesis."  *See* http://my.clevelandclinic.org/disorders/back_pain/hic_spondylolysis.aspx (last visited September

(Tr. 226).

Plaintiff was still complaining of a chronic, sharp pain in her lower back on August 5, 2009 (Tr. 206). Plaintiff reported that nothing relieved her pain, which increased when she moved and when she was in an upright position; she had difficulty walking (Tr. 209). Plaintiff was instructed to stay off her feet, use ice to help relieve pain, and remain off work until August 12, 2009 (Tr. 212-213).

Plaintiff had another MRI of her lumbar spine on August 11, 2009 that revealed the following:

1.   Satisfactory post op study with expected changes at L5-S1 on the right side.

2.   No recurrent disc herniation is seen. No indication of any significant epidural fibrosis is present.[13]

3.   Minimal degenerative changes at L4-5 previously described [as an] annular tear is less apparent.[14] A complicating process such as disc herniation, thecal sac stenosis or neural foraminal compromise is not identified. The rest of the lumbar spine is unremarkable.

(Tr. 227).

On November 2, 2009, Plaintiff had a sharp pain in her lower back that radiated to her legs and improved when she stopped walking (Tr. 233).

_____

7, 2013).

[13]"Epidural fibrosis is one of the most common causes of failed lumbar spinal back surgery and back surgery syndrome. Symptoms include moderate to severe back pain, including sciatic nerve issues, with no discernible herniation or other medical cause." *See* http://www.wisegeek.com/what-is-epidural-fibrosis.htm (last visited September 9, 2013).

[14]"An annular tear occurs when the tough exterior (or the annulus fibrosus) of an intervertebral disc rips or tears." *See* http://www.laserspineinstitute.com/back_problems/annular_tear/ (last visited September 9, 2013).

In a letter dated November 11, 2009, Gerald R. Schell, M.D., stated:

> [Plaintiff] has had trouble with severe back pain. It has been quite problematic.
> She has had an L5-S1 disc pathologies[sic] on the opposite side now. She has
> disc space collapse and I suspect that a lot of her pain is coming from the
> degenerative changes of her lumbar spine. I have gone over that situation with
> her in considerable detail and I think that she has a good understanding and for
> the most part she is miserable with that. I think that she would probably benefit
> from a lumbar interbody fusion directed at the L5-S1 level. We will try to make
> arrangements for that to be done for her in the near future.

(Tr. 312). Plaintiff had an OptiMesh fusion on December 21, 2009 (Tr. 295).[15] Before the

procedure, Plaintiff complained of incapacitating pain in her back that radiated down her right

lower extremity, and numbness in her toes on the left foot (Tr. 294, 296). On examination,

Plaintiff had decreased range of motion in her back, back spasms, positive straight-leg raising at

45 degrees,[16] and weakness with dorsiflexion in her left foot; she had full strength in her right

lower extremity in all muscle groups tested (Tr. 294, 296). It was noted that Plaintiff's

incapacitating back pain was caused by a collapsed disc (Tr. 295).

A CT evaluation of Plaintiff's lumbar spine on December 29, 2009 revealed the

following:

> There has been interval fusion of the L5-S1 interspace utilizing cement. There
> has been surgical placement of a surgical screw within the left posterior elements
> of L5-S1. The remaining intervertebral disc spacings and the vertebral body
> heights appeared adequately maintained. Vertebral body alignment appeared
> normal. There is diffuse central bulging of the annulus fibrosus noted at L4-5.
> There was no definite evidence of herniated nucleus pulposus. There was no

---

[15]"Spinal fusion surgery is designed to stop the painful disc motion in [the] spine or to
stabilize [the] spine after removing tissues that are impinging on [the] nerves." *See*
http://www.thespinaldoctor.com/index.php?anchor=_optimesh (last visited September 9, 2013).

[16]A straight-leg raise test helps determine if an individual has nerve root irritation. A
negative test means the individual did not experience pain when the leg was elevated between 30
and 60 degrees, and it helps rule out nerve root irritation as the cause of pain. *See*
http://meded.ucsd.edu/clinicalmed/joints6.htm (last visited September 9, 2013).

spinal canal stenosis evident.[17]  There is mild bilateral facet arthritis at L3-4, L4-5
& L5-S1.  The remaining facet articulations appeared intact.  The exit foramina
appeared patent bilaterally.  There were no acute fractures evident.  There were
no lytic or blastic bony destructive changes noted.  There appears to have been [a]
left lateral osseous fusion at L5-S1.

(Tr. 311).

On January 6, 2010, Plaintiff reported numbness in her left lower leg that radiated into

her toes on the left foot, causing her to lose sleep.  On examination, Plaintiff's gait was steady;

she could walk on her tiptoes and heels without difficulty, and had full strength in her bilateral

lower extremities in all muscle groups tested except one.  Plaintiff had a mildly positive straight-

leg raising test at 90 degrees on the left side (Tr. 314).

In a letter dated February 10, 2010, Dr. Schell stated:

[Plaintiff] had a recurrent disc pathology at the lumbosacral junction.  She had
that interbody lateral fusion back in the end of December.  Although the intensity
of her symptoms are easing she still has some burning dysesthesia's[sic] of her
left foot.[18]  She has pretty good movement of her left foot.  She had a CT scan
which was done following her surgery.  It demonstrates the bone grafting is in
good position and alignment.  She does have pretty good strength of her
extremities.  She has some decreased sensation more in an L5 distribution.  I
suspect that there is some nerve swelling.  She thinks that the intensity of her pain
is easing.  She is walking relatively well, making some progress.  We have
refilled her medications and we will see her back in two months with AP & lateral
x-rays of her lumbar spine.

(Tr. 316).  An x-ray of Plaintiff's lumbar spine on March 26, 2010 found that "[a] left surgical

screw [was] traversing the posterior elements of L5-S1.  The remaining intervertebral disc

spacings [and] vertebral body heights appeared adequately maintained.  Vertebral body

---

[17]"Spinal stenosis is a narrowing of the open spaces within [the] spine, which can put
pressure on [the] spinal cord and the nerves that travel through the spine."  *See*
http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (last visited September 9, 2013).

[18]"The word dysesthesias is derived from the Greek 'dys,' which means 'bad,' and
'aesthesis,' which means 'sensation.'  Thus, dysesthesias are 'bad sensations' and the word
refers to pain or uncomfortable sensations, often described as burning, tingling, or numbness."
*See* http://www.healthline.com/galecontent/dysesthesias (last visited September 9, 2013).

alignment appeared normal.  The lumbar pedicles, transverse processes & spinous processes appeared intact" (Tr. 317).

In a letter dated April 14, 2010, Dr. Schell stated:

[Plaintiff] is being seen four months postoperatively.  She is continuing to make good progress.  She has good strength in her extremities.  She is coming along well.  We will get her involved in low impact aerobic exercise program.  Her neurological status otherwise is stable.  We will see her back should further questions or problems arise.

(Tr. 318).

Plaintiff had physical therapy from June 2, 2010 until September 1, 2010 (Tr. 386, 445-447).  She reported that she had a dull, aching pain in her lower back that radiated down her left leg causing it to go numb; Plaintiff also felt a "pin and needles" sensation in her feet when she lay on her stomach (Tr. 387).  According to Plaintiff, she had to hold on with both hands to ascend a flight of stairs (Tr. 387).  Plaintiff reported that her pain increased when she: (1) sat in a soft chair for 5-10 minutes (although, she later reported that she could sit in any chair as long as she wanted without pain); (2) walked more than half a mile (although, she later reported that the pain did not prevent her from walking any distance); (3) picked objects up off the floor; (4) coughed or sneezed; (5) stood for longer than 45 minutes (although, she later reported that the pain she felt when standing did not increase with time); (6) mopped and swept the floor; (7) bent down; (8) washed and dressed herself; and, (9) donned and doffed her shoes and socks (Tr. 387, 391, 393).  Her pain decreased when she sat in a firm chair or took medication (Tr. 387, 393).  Plaintiff also reported that she wakes up in pain 2-3 times a night; her pain was the least in the afternoon and the greatest at night (Tr. 387, 393).

On June 4, 2010, Plaintiff reported that she had trouble standing, working, sitting, and completing household activities; her legs would "give out" (Tr. 319).  Plaintiff also reported that she becomes uncomfortable if she walks more than a mile (although, she walked one to 1.5 miles

a couple times a week).  Plaintiff could sit for 30-45 minutes, wash dishes, dust, vacuum, wash

clothes, mop, prepare and cook simple meals, bathe, groom and dress herself, run errands

without assistance, and cut the grass with a riding mower (Tr. 319-320).

On August 13, 2010, Dr. Schell limited Plaintiff to lifting no more than 5-10 pounds; no

pushing, pulling, bending, twisting, or reaching above shoulder level; and, no climbing stairs or

ladders (Tr. 437).

A CT of Plaintiff's lumbar spine on August 18, 2010 revealed:

The left facet joint at L5-S1 has been transfixed by a screw.  These findings were
also identified on the previous examination.  There is a radiolucency along the
posterior aspect of the screw, inferior articular process of L5, not displayed on the
previous study.  Loosening cannot be excluded.  At L5-S1 on the right, there is
some loss of the epidural fat in the region of the S1 nerve root.  While these
findings may represent scarring, the possibility of a disc herniation cannot be
excluded.  If clinically warranted, an MRI might be helpful for further evaluation.

There is a defect at the base of the inferior articular process of L5 on the right,
similar to the previous study.  This may be developmental or secondary to
previous trauma.

(Tr. 440).

On March 4, 2011, Plaintiff complained of a sharp, cramping, and numbing pain

throughout her cervical, thoracic and lumbar spine that radiated into her legs and increased with

activity (Tr. 464).  On examination, there was no tenderness, scoliosis, muscle wasting, edema,[19]

---

[19]Edema is "the presence of abnormally large amounts of fluid in the intercellular tissue
spaces of the body, usually referring to subcutaneous tissues.  It may be localized (such as from
venous obstruction, lymphatic obstruction, or increased vascular permeability) or systemic (such
as from heart failure or renal disease)." *Dorland's Illustrated Medical Dictionary*, 600 (31st Ed.
2007).

cyanosis,[20] or kyphosis;[21] Plaintiff had full range of motion in both her cervical and lumbar spine with no pain upon extension, flexion, or lateral rotation; and, she had full strength in her upper and lower extremities (Tr. 466).  Plaintiff's straight-leg raising tests were negative (Tr. 466). Plaintiff was diagnosed with lower back pain secondary to disc herniation (Tr. 466).

An x-ray of Plaintiff's lumbar spine on March 7, 2011 revealed "[a] surgical screw is identified traversing the left facet joint of the L5-S1 level.  The lumbar vertebral bodies and discs are in normal alignment.  There is no evidence [of] spondylolysis or spondylolisthesis" (Tr. 357).

On March 14, 2011, Plaintiff complained of a sharp, aching pain in her lower back that radiated into her right buttock and worsened with movement.  Plaintiff also reported numbness down her left leg into her foot.  On examination, Plaintiff had full strength in her bilateral upper and lower extremities; her straight-leg raising test was negative; and, there was no cyanosis, muscle wasting or edema (Tr. 476).

On April 4, 2011, Plaintiff visited Dr. Mark Adams, M.D. and posed a myriad of questions.  Dr. Adams did not recommend that Plaintiff have another surgery; he found that Plaintiff would be better served with epidural shots and pain management (Tr. 498).

On May 12, 2011, Plaintiff complained that her right shoulder was lower than her left (Tr. 330).

An x-ray of Plaintiff's thoracic spine on May 16, 2011 revealed "[t]here is normal alignment of the thoracic vertebral bodies and discs.  There is no definite evidence for scoliosis.

---

[20]Cyanosis is "a bluish discoloration, especially of the skin and mucous membranes due to excessive concentration of deoxyhemoglobin in the blood."  *Dorland's Illustrated Medical Dictionary*, 460 (31st Ed. 2007).

[21]"Kyphosis is a forward rounding of [the] upper back.  Some rounding is normal, but the term 'kyphosis' usually refers to an exaggerated rounding – sometimes called round back or hunchback."  *See* http://www.mayoclinic.com/health/kyphosis/DS00681 (last visited September 9, 2013).

No lytic or blastic lesions are identified" (Tr. 355).  On May 18, 2011, an x-ray of Plaintiff's

lumbar spine revealed:

> There is normal alignment of the lumbar vertebral bodies and discs.  A screw is
> identified in the left pedicle at the L5-S1 level.  Changes of severe osteoarthritis
> are identified at L5-S1.  The remainder of the lumbar spine is in normal
> alignment.  No lytic or blastic lesions are identified.

(Tr. 354).  On October 13, 2011, an MRI of Plaintiff's lumbar spine revealed:

> There is minor dextroscoliosis.[22]  Vertebral height is maintained.  There is mild
> anterolisthesis of L5 relative to S1[23] and retrolisthesis of L4 relative to L5.[24]
> Conus medullaris terminates at the L1-L2 level and is normal in signal and
> morphology.  Vertebral body hemangioma at L3 is unchanged.  There is
> degeneration of L4-L5, L5-S1, T10-T11, and T11-T12 disks.  At T10-T11, there
> is a small central disk protrusion/extrusion effacing the thecal sac without neural
> foraminal stenosis.[25]  At T11-T12, there is a tiny central disk protrusion without
> stenosis.  No axial images through these levels.
>
> Axial images:
>
> T12-L1 through L3-L4: No disk herniation or stenosis.
>
> L4-L5: Mild disk bulge with central annular tear and facet degeneration cause
> mild neural foraminal stenosis.

---

[22]"[D]extroscoliosis is a specific term meaning scoliosis of the spine with a curvature of
the spine to the right."  *See* http://scoliosisbrace.ca/destroscoliosis/ (last visited September 9,
2013).

[23]"In anterolisthesis, the upper vertebral body is positioned abnormally compared to the
vertebral body below it.  More specifically, the upper vertebral body slips forward on the one
below."  *See* http://www.cedars-sinai.edu/Patients/Health-Conditions/Anterolisthesis.aspx (last
visited September 9, 2013).

[24]"A retrolisthesis is an acute, degenerative, or congenital condition in which a vertebra
in the spine becomes displaced and moves backward.  In most cases, retrolisthesis occurs when a
soft disc that separates and cushions vertebrae either deteriorates or ruptures.  Without the
support of the disc, the upper vertebra slips out of place and puts pressure on the bone below it."
*See* http://www.wisegeek.com/what-is-a-retrolisthesis.htm (last visited September 9, 2013).

[25]At every level of the spine the nerves will exit through a small canal.  This canal is
called the foramen or foraminal canal.  Foraminal stenosis is a narrowing of this canal."  *See*
http://www.laserspineinstitute.com/back_problems/foraminal_stenosis/ (last visited September 9,
2013).

-15-

L5-S1: Right hemilaminectomy changes once again identified.  There is endplate degenerative edema and disk degeneration/enhancement similar to the prior.  Enhancing tissue is present within the ventral and right lateral epidural space contacting the bilateral S1 nerve roots right greater than left and exiting right L5 nerve root.  There is left facet arthropathy.  There is mild to moderate left/moderate right neural foraminal stenosis.

IMPRESSION:

1.      No significant interval change.

2.      L5-S1, stable enhancing tissue contacts the bilateral S1 nerve roots left greater than right, and right L5 nerve root most likely related to epidural fibrosis.  No definite residual/recurrent disk herniation seen.

3.      Stable minor dextroscoliosis, mild anterolisthesis of L5 relative to S1 and retrolistesis of L4 relative to L5, and endplate and disk degenerative change at L5-S1.

4.      L4-L5, mild disk bulge with central annular tear and mild facet degeneration causes mild neural foraminal stenosis.

5.      T10-T11, there is a small central disk protrusion/extrusion effacing the thecal sac without neural foraminal stenosis and had T11-T12, there is a tiny central disk protrusion without stenosis.  No axial images through these levels.

(Tr. 526-527).

### 3.      Vocational Expert

The ALJ asked the VE to assume an individual who could perform work at the sedentary exertional level but could only occasionally operate foot controls with her right foot, perform overhead reaching and handling, and perform postural functions (Tr. 58-59).  The VE testified that such an individual could not perform Plaintiff's past relevant work (Tr. 59).  The individual could perform work as a surveillance system monitor, production inspector checker, small parts assembler, and telephone information clerk (Tr. 59-60).

### D.      *Plaintiff's Claims of Error*

### 1.    Medical History

Plaintiff first argues that the ALJ's decision was based on only part of her medical history, and that the ALJ failed to consider all of the evidence.  As a result, Plaintiff suggests that the ALJ's RFC determination was incorrect: "[t]hey tryed[sic] to tell me what kind of a job I could do and I think that I know what I and my body are capable of doing" (Dkt. No. 14).

As an initial matter, "Plaintiff fail[ed] to identify any specific evidence that the ALJ did not consider or that [s]he mischaracterized that would require an alternative outcome in this matter. Such a lack of detail in most cases would end the Court's inquiry."  *Osley v. Comm'r of Soc. Sec.*, No. 12-12279, 2013 WL 3456963, at *7 (E.D. Mich. July 9, 2013) (citing *Kennedy v. Comm'r of Soc. Sec.*, 87 Fed. Appx. 464, 466 (6th Cir. 2003) ("[I]ssues which are adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks and citation omitted)).  "However, the pleadings of a *pro se* litigant are to be liberally construed."  *Osley*, 2013 WL 3456963, at *7 (citations omitted). "Further, in Social Security cases, the failure to submit a brief or full blown legal arguments '[are] not a prerequisite to the Court's[sic] reaching a decision on the merits' or a finding *sua sponte*, that grounds exists for reversal.  *Id.* (citation omitted).  Because Plaintiff is proceeding *pro se*, this Magistrate Judge conducts an independent review of the record.

The ALJ was not required to discuss every piece of evidence in the administrative record, *Kornecky*, 167 F. App'x at 508, and she did consider a substantial portion of Plaintiff's medical history.  For example, she considered Plaintiff's MRIs on February 8, 2006 and August 11, 2009 (Tr. 28-29); Plaintiff's x-rays on July 30, 2009 and March 26, 2010 (Tr. 29-30); the fact that Plaintiff had an interbody fusion done on December 21, 2009 (Tr. 29); Plaintiff's CT scan on December 29, 2009 (Tr. 29); Dr. Schell's February 10, 2010 and April 14, 2010 letters (Tr. 30);

Plaintiff's decreased range of motion, muscle spasms, and tenderness on September 15, 2009 (Tr. 29); and, her mildly positive straight-leg raising test on January 6, 2010 (Tr. 29-30).

But, on August 13, 2010, Dr. Schell – whom the ALJ refers to as Plaintiff's *treating* neurologist (Tr. 29-31) – limited Plaintiff to *no* pushing, pulling, bending, twisting, or reaching above shoulder level; and, *no* climbing stairs or ladders "until further notice" (Tr. 437).[26]  Yet, the ALJ's RFC determination limited Plaintiff to *occasional* overhead reaching and handling; and, *occasional* climbing of ladders, ropes, and scaffolds (Tr. 27).[27]  In determining that Plaintiff was not disabled, the ALJ relied on the VE's testimony in response to an hypothetical question that included the limitation that Plaintiff could *occasionally* perform overhead reaching and handling, and *occasionally* perform postural functions (Tr. 58-59); *see also* Tr. 35:

> Based on the testimony of the vocational expert, I conclude that, considering [Plaintiff's] age, education, work experience, and residual functional capacity, [Plaintiff] is capable of making a successful adjustment to other work that exists

---

[26]As correctly stated by the ALJ, "no treating physician has indicated that [Plaintiff] is disabled" (Tr. 31), but this is irrelevant; an opinion from a treating source regarding whether Plaintiff is disabled is an issue that is reserved to the Commissioner and is never afforded controlling weight.  SSR 96-5p.  This issue here is whether Plaintiff's treating neurologist's opinion regarding Plaintiff's *functional limitations* should be afforded controlling weight.  *See* 20 C.F.R. § 404.1527(a)(2).

[27]The ALJ's entire reasoning was the following:

Considering [Plaintiff's] obesity along with her back condition as discussed above, I conservatively find that [Plaintiff] is limited to occasional climbing of ladders, ropes, scaffolds, ramps, and stairs.  Similarly, she occasionally can balance, stoop, crouch, kneel, crawl, and reach overhead.  X-rays of [Plaintiff's] right knee and right elbow were taken in October 2006 and October 2009, respectively; both studies revealed no abnormalities.  Similarly, venous and arterial duplex studies of the lower extremities showed bilateral deep venous insufficiency, superficial venous insufficiency on the right associated with varicose veins, and no evidence of deep venous thrombosis or significant arterial stenosis.

(Tr. 32).

in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

The Sixth Circuit has instructed ALJs on how to assess opinions from treating sources like Dr. Schell:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).

> The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Id.* § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) reh'g denied (May 2, 2013).

The ALJ did not analyze Dr. Schell's opinion as required by *Gayheart*.[28] As such, this case should be remanded to determine the amount of weight to afford Dr. Schell's August 13, 2010 opinion, and whether his functional limitations should have been included in the hypothetical to the VE.

### 2.    Plaintiff's Opportunity to Explain her Limitations

---

[28]When summarizing Plaintiff's testimony, the ALJ mentioned that "[o]ther restrictions given to her by Dr. Schell include[d] no lifting, twisting, turning, and no reaching above shoulder level" (Tr. 28). But, she failed to mention Dr. Schell's opinion in her analysis (Tr. 28-33).

Plaintiff's final argument is that when she tried to address an issue during the administrative hearing, the ALJ did not want to hear it, and she would direct her towards a different area.  Plaintiff says she did not have an opportunity to explain her limitations and how she feels on a daily basis.

When Plaintiff attempted to explain her limitations at the beginning of the hearing, the ALJ directed her to discuss her medical conditions:

PLAINTIFF:  My ability to do certain daily tasks is a challenge.

ALJ:         Okay.

PLAINTIFF:  Sitting to do dishes.

ALJ:         I'll ask you about all of that.  Right now, I just want to know what the medical conditions are that you have.

(Tr. 46).  However, the ALJ gave Plaintiff an adequate opportunity to explain her limitations and how she feels on a daily basis:

ALJ:         Okay, take me through a typical day from the time you get up until the time you go to sleep.

PLAINTIFF:  I get up and I try to do as much housework as I possibly can.

ALJ:         What does that involve?

PLAINTIFF:  Laundry, dishes, light dusting, a little vacuuming if I can, occasional sweep[sic], mop but I have a hard time.

ALJ:         And what happens when you say you have a hard time?

PLAINTIFF:  My body starts – it like – I can't even – I don't know if I can describe it.  I get a really bad pain with bending, twisting.  I have – my hip kind of pops and gives out on me sometimes.  Overall, these sitting and, you know, I lay[sic] down periodically though the day sometimes to take a nap.

ALJ:         How about your sleep at night?  Any trouble sleeping at night?

PLAINTIFF:  Oh yeah.

-20-

ALJ:            And what happens at night?

PLAINTIFF:    I have to lay[sic] on my left side to be able to sleep comfortably.  I
                can't lay[sic] flat on my back.  I have to have my feet elevated.
                When I turned[sic], there's like a sharp pain and it wakes me.  I'd
                have to take pain medication sometimes just to be able to sleep.

                            *       *       *

ALJ:            Okay, today, what is your level of pain on a scale of one to 10[?]

PLAINTIFF:    About an eight.

                            *       *       *

ALJ:            Okay, when you are sitting, are you in pain?

PLAINTIFF:    Yes.

ALJ:            Is [it] more painful to be sitting or standing?

PLAINTIFF:    I – it takes its tolls.  I can have a good day where I can sit for a
                little while and a bad day where I can[sic] sit for very long at all.  I
                have very few good days.

ALJ:            How about walking?  How far are you able to walk?

PLAINTIFF:    [laughs], walking, I don't want[sic] very much anymore by myself.
                I started having problems with my foot rolling on me and I feel, so
                I don't walk by myself at all hardly.

ALJ:            Do you drive?

PLAINTIFF:    Yes, I'm the only one that can drive in my household.

                            *       *       *

ALJ:            When you are driving, are you in pain?

PLAINTIFF:    Yes.

ALJ:            What is painful?

PLAINTIFF:    Sometimes pushing on the pedals said[sic] the pain up to my lower
                body.  Sometimes just sitting for a period of time.

-21-

ALJ:              How much can you lift?

PLAINTIFF:  About 25 pounds is my restriction[.]

                              *      *      *

ALJ:              What other restrictions [do you have?]

PLAINTIFF:  No lifting, twisting, turning, nothing about shoulder reaching-wise.

ALJ:              And is that because you have upper body problems as well?

PLAINTIFF:  Well, I'm crooked very bad.

ALJ:              So you said no twisting, bending, turning.  What else?

PLAINTIFF:  Reaching like above head – shoulder level, whatever.

                              *      *      *

ALJ:              Okay.  Tell me about the plantar fasciitis.

PLAINTIFF:  They say that it's – I don't know too much about it myself but they
                 say that the muscle and the bone in my foot are separating.

ALJ:              Which foot is that?

PLAINTIFF:  My right.

ALJ:              And how does that affect you?

PLAINTIFF:  It's the pulling when you walk, the burning.

ALJ:              Is that all the time or just after you've walked for certain
                 distances?

PLAINTIFF:  It just depends if I stand too long or if I walk.

ALJ:              Okay.  Is there anything that I haven't covered that you would like
                 to tell me?

PLAINTIFF:  I don't know.  I have a doctor that was supposed to do a procedure
                 to help fix me and he won't even touch me because he doesn't
                 know if it's going to make it better or worse.

                              *      *      *

-22-

PLAINTIFF:    It was Dr. Adams out of Saginaw, Dr. Mark Adams and my primary care provider and a few other doctors have stated that I put on so much weight which I have because I can't get – I'm not very mobile to do my daily stuff anymore so they want to put me – a lap band to see if I can lose some weight to feel better.

*   *   *

ALJ:          Okay, anything else that I might've missed?

PLAINTIFF:    I don't know.

(Tr. 49-55).  This Magistrate Judge finds no error in the ALJ's questioning of Plaintiff.

## IV.    CONCLUSION

Because it is unclear whether the ALJ considered Plaintiff's treating neurologist's opinion, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, the Commissioner's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *See McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this Magistrate Judge but this does

not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due

within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of

service of the response.  *See* E.D. Mich. LR 72.1(d)(3), (4).

s/Mark A. Randon

Mark A. Randon

United States Magistrate Judge

Dated:  September 13, 2013

*Certificate of Service*

     *I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, September 13, 2013, by electronic and/or ordinary mail.*

*s/Tanya Bankston Acting for Eddrey Butts*

*Case Manager for Magistrate Judge Mark A. Randon*